Receipt number AUSFCC-11412899

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

COMMUNITY POWER,

Plaintiff,

v.

UNITED STATES,

Defendant.

Case No. **26-1172 C**

# COMPLAINT

Plaintiff Community Power, for its complaint in this action, alleges as follows:

## NATURE OF THIS ACTION

1. Community Power is a grantee of a funding award issued by the U.S. Environmental Protection Agency. EPA issued the award in accordance with a Congressionally authorized funding program. The award constitutes a binding and enforceable legal contract between Community Power and the United States.

2. Community Power brings this action because EPA, acting unilaterally, terminated the funding award unlawfully. That termination constitutes actionable breach of the parties' contract, both express and implied. Community Power, as well as the community it serves, suffered (and continues to suffer) substantial injury because of the breach. It is entitled to recover damages.

## JURISDICTION AND VENUE

3. Jurisdiction over the claims advanced in this case is proper in this Court under the Tucker Act, 28 U.S.C. § 1491.

4. Venue is properly lodged in the United States Court of Federal Claims located in Washington, D.C.

## THE PARTIES

5. Plaintiff Community Power is a 501(c)(3) tax-exempt nonprofit corporation established under the laws of Minnesota.

6. Defendant is the United States of America, acting through the United States Environmental Protection Agency ("EPA"), an independent agency within the Executive Branch of the United States government, and through EPA's current Administrator Lee Zeldin.

## FACTS

7. The facts set forth below are based principally on documentary evidence.

### A. Community Power and EPA Enter Into a Binding and Enforceable Contract

#### (i) By a Request for Applications, EPA Offers to Provide Financial Assistance Grants Under a Congressionally Authorized Funding Program

8. On January 10, 2023, EPA, through its Office of Environmental Justice and External Civil Rights, issued a Request for Applications, Funding No. EPA-R-OEJECR-OCS-23-01, titled "Environmental Justice Collaborative Problem-Solving (EJCPS) Cooperative Agreement Program." ("RFA"; **Exhibit 1**).

9. The RFA solicited funding applications described as follows:

> [F]or projects supporting community-based nonprofit organizations (CBOs) in their efforts to collaborate and partner with other stakeholders . . . to develop solutions that will *significantly address environmental and/or public health issue(s) in communities disproportionately burdened by environmental harms and risks.* These projects will help transform disadvantaged and underserved communities

> into healthy, thriving communities capable of addressing the environmental and public health challenges they have historically faced, as well as current and future challenges (RFA at 2; emphasis added).

10. The RFA stated that it was "launched in order to meet the goals and objectives of two Executive Orders" aimed at "achieving environmental justice and embedding environmental justice into [EPA] programs." (*Id.*). And it characterized "Environmental Justice" -- "the common theme" of the Executive Orders -- "as the ***fair treatment*** and ***meaningful involvement*** of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." (*Id.* at 2-3; bold in original).

11. Only CBOs -- community-based nonprofit organizations -- "[were] eligible for funding under this RFA." (*Id*. at 3). The RFA defined a CBO "as a *public or private nonprofit organization that supports and/or represents a community and/or certain populations within a community through engagement, education, and other related services provided to individual community residents and community stakeholders*." (*Id*.; italics in original).

12. The RFA also set forth funding criteria related to EPA's "Strategic Plan" and to "Anticipated Outputs" and "Outcomes" measures. (*Id.* at 13-15). Among those criteria, EPA was required to "link" assistance agreements under the RFA "to the Agency's Strategic Plan," set forth at https://www.epa.gov/planandbudget/strategicplan. (*Id.* at 13). In particular, the RFA stated that funding grants were required to support "Goal 2" of the FY 2022-2026 EPA Strategic Plan, described as "Take Decisive Action to Advance Environmental Justice and Civil Rights"; and "Objective 2.1," described as "Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels." (RFA at 13).

13. The Strategic Plan itself stated that "[it] is bold and unprecedented in its commitment to advancing environmental justice and civil rights." (*See* FY 2022-2026 EPA Strategic Plan, at 5, available at https://www.epa.gov/system/files/documents/2022-03/fy-2022-2026-epa-strategic-plan.pdf ). It explained that "grantmaking" was among its "policy and legal tools" for accomplishing EPA's goals and objectives for environmental and climate justice." (*Id.*, Plan at 5).

14. Congress had authorized the RFA funds under the Consolidated Appropriations Act, 2022 and the 2022 Inflation Reduction Act. (RFA at 3). The latter created a funding program, known as the Environmental and Climate Justice Block grant program, in Section 138 of the Clean Air Act (42 U.S.C. § 7438) that "provided EPA with $2.8 billion in grant funding . . . for projects to benefit disadvantaged communities." (RFA at 3, 4). The RFA stated that under "the Environmental Justice Collaborative Problem-Solving (EJCPS) Cooperative Agreement Program," financial assistance was available "to support community-based nonprofit organizations to collaborate and partner with other stakeholders . . . to develop solutions that will significantly address environmental and/or public health issue(s) at the local level." (*Id.* at 4). Accordingly, "[t]he program's objective [was] to support projects that demonstrate the utility of the [EJCPS] Model." (*Id.* at 5).

15. The RFA stated that all applications needed to follow "competitive" procurement requirements. (*Id.* at 1).

**(ii) <u>By Applying For a Funding Grant, Community Power Accepts EPA's Offer</u>**

16. In <u>early April 2023</u>, Community Power submitted its application for funding (titled "Environmental Justice Collaborative Problem-Solving (EJCPS) Proposal"). ("<u>Proposal</u>";

**<u>Ex. 2</u>**). The Proposal's project was titled "Twin Cities Energy Efficiency Cohort and Navigator Project."

17. The Proposal described Community Power as "a coalition-formed non-profit focused on expanding clean, local, equitable, affordable, and reliable energy options for Minneapolis residents as well as cities and towns across Minnesota." (Proposal at 1). It described Community Power's work as including "capacity-building local Community Based-Organizations (CBOs) and community leaders to engage in energy decision-making; direct outreach to engage residents in local energy democracy projects such as cooperatively-owned solar; voter and candidate education on energy; and policy work on energy access." (*Id.*)

18. The Proposal abstract summarized the project's objective as follows:

> The project aims to address a central bottleneck in access . . . to the cost-savings, health, and safety benefits of efficiency programs: *lack of culturally relevant, community-rooted outreach and support to navigate the highly complex network of Minnesota efficiency programs.* This work builds on three years of capacity development and relationship building with ~15 local CBOs and community leaders who serve or come from Twin Cities renter, low/moderate income, and BIPOC communities. *This group has generated a strong analysis of the barriers as well as the important strategies to intervene in an energy system that is not equitably serving residents.*" (Proposal at 1; emphasis added)

19. Among the project's "special considerations" was its "focus[] on dramatically increasing access to energy efficiency *to economically and socially marginalized communities*." (*Id.*; emphasis added).

20. The Proposal adhered paragraph-by-paragraph to the RFA's specified "Content and Form" for applications (*see, e.g.*, RFA at 23-30 & Proposal, *passim*). This material included: (i) a detailed budget; (ii) meticulous environmental and public health data "of the Underserved Community"; (iii) a thorough "EJCPS Model"; (iv) a specific explanation of how the project will meet the "Collaborative Problem-Solving Model Elements" for funding approval; and (v)

comprehensive data of localized disadvantaged-communities indicators, as well as further information addressing each of the RFA's other criteria.

21. The Proposal met the purpose and goals of funding prescribed in the RFA, particularly the goal of promoting "Environmental Justice."

**(iii) EPA Confirms the Offer and Acceptance; Community Power Begins to Perform Its Contractual Obligations**

22. EPA accepted Community Power's Proposal. On October 20, 2023, EPA notified Community Power that "[it] has been selected to receive an EPA award" under the EJCPS program. (Oct. 20, 2023 email from EPA's Jacob Burney; **Ex. 3**). The notice explained that it was "NOT an official award" and that Community Power would need to meet further requirements to receive the award. (*Id.*). In particular, Community Power would be expected to present an assigned EPA Project Officer with a "budget, workplan, performance measures, and activity timeline." (*Id.*).

23. That same day, Community Power accepted its selection, writing in its email that it was "very excited" about being selected and confirming its desire to work with the assigned EPA Program Officer to finalize an award. (*Id.*).

24. According to EPA public data, 2,700 applicants sought funding; Community Power was one of only 105 who eventually received an award. *See* https://www.epa.gov/newsreleases/biden-harris-administration-announces-nearly-16-billion-environmental-and-climate.

25. Promptly upon its selection to receive an award, Community Power engaged with EPA to take the next steps. Community Power worked with EPA Project Manager Amber Sample in accomplishing the procedural requirements for receiving the funding.

26. Community Power's actions, undertaken with Sample's guidance and support, included, among other things: (i) communicating with EPA personnel to better understand the specific requirements for obtaining an award; (ii) answering EPA's questions about Community Power's proposed activities; (iii) preparing budgets and budget narratives describing the activities, as well as submitting associated SF-424A forms; and (iv) completing EPA's Administrative and Review Questionnaire (Form 6600-01). (*See* select applicable documents, collectively, **Ex. 4**).

27. Community Power undertook these actions in support of the RFA's stated goals and the requirements for receiving an award. Community Power's efforts were extensive, time-consuming, and required substantial resources, all done in reasonable reliance on EPA's initial selection of Community Power to receive an award.

**(iv) EPA Formalizes the Contract in a Funding Award Cooperative Agreement**

28. On July 23, 2024, EPA issued its Cooperative Agreement with Notice of Award to Community Power. ("Award"; **Ex. 5**). The Award stated that EPA "hereby awards $500,000.00" and that "EPA agrees to cost-share 100% of all approved budget period costs incurred." The funding was for July 1, 2024 through June 30, 2027.

29. The Award was issued and entered into by "The United States of America By the U.S. Environmental Protection Agency" with the digital signature "applied by EPA Award Official for Sheila Dolan – Regional Administrator by Karen Sykes – Award Official Delegate." (Award at 1). These officials had actual or other legal authority to issue and enter into the Award for the United States and the EPA.

30. The Award provided that to accept the Award, "[Community Power's] signature is not required on this agreement." (*Id.*). Acceptance existed: (i) by Community Power "not

filing a notice of disagreement with the award terms and conditions" within 21 days after the mailing date or (ii) by drawing down funds within that period. (*Id.*).

31. The Award, per its terms, "provides funding under the Inflation Reduction Act" (Award at 4), and it incorporated as "Regulatory Authority" (among other provisions) 2 C.F.R. 200 and 2 C.F.R. 1500. (*Id*. at 2). The Award set forth Community Power's stated purpose for the funding: "The recipient aims to address a central bottleneck in access for to [*sic*] the cost-savings, health, and safety benefits of efficiency programs that lack of culturally relevant, community-rooted outreach and support to navigate the highly complex network of Minnesota efficiency programs." (*Id.* at 4). Likewise consistent, the Award's "intended beneficiaries include[d] disadvantaged communities in Minneapolis and St. Paul, MN." (*Id.*).The Award stated that Community Power would "focus on planning for and designing the community-focused energy program navigation," which included hiring "community navigators" to implement programs. (*Id.*).

32. The Award further stated -- aligning directly with the RFA funding objectives -- that "[t]he goal is to have an energy navigation program become a permanent program." (*Id.*). Accordingly, the Award provided that the "anticipated deliverables" included the development of a "pilot program" that would be "implement[ed] . . . over the course of the grant." (*Id.*).

33. The Award was consistent with 31 U.S.C. § 6305(1), which states that a grant agreement provides for the "transfer a thing of value to the . . . [award] recipient to carry out a public purpose of support or stimulation authorized by a law of the United States."

34. In consideration for receiving its $500,000 funding grant, the Award required Community Power to meet numerous "Administrative" and "Programmatic" terms and conditions, including requirements for informational reporting to EPA. (*See* Award at 5-12). For

example, the Award "require[d]" Community Power to submit to EPA: (i) "MBE/WBE reports (EPA Form 5700-52A)" (*id.* at 6), as mandated under 40 C.F.R. Part 33 (among other regulations), for reporting data on minority-owned and women-owned business enterprises; these reports generally and historically enabled the federal government to evaluate the scope and effectiveness of its disadvantaged business programs; (ii) "performance reports," in accordance with 2 C.F.R. 200.329, which per the Award could include information on "best practices," "lessons learned," and references to "materials that may be helpful to other Environmental Grants recipients or similar organizations" (*id.* at 8); and (iii) future updates on Community Power's environmental justice work, "[f]or no less than one year after completion of the project," in order to enable EPA "to track best practices that lead to greater project sustainability" and "community revitalization" for EPA's grants generally under its Environmental Justice Grants program. (*Id*. at 9-10).

35. Under this post-project update requirement, the funding grant was intended to be forward-looking in providing EPA with data to evaluate its program. The Award stated: "The EPA EJ Grants program is invested in the long-term success of each EJ Grant recipient and its long-term impact on addressing the disproportionate environmental and public health impacts plaguing their communities." (*Id*. at 10).

36. In addition to these specific information and data reports, the Award required Community Power to (i) submit to EPA "Federal Financial Reports (SF-425)"; (ii) complete training sessions in grant management and developing budgets, which included certifying compliance with EPA; (iii) provide reports on "subaward performance"; and (iv) engage in "monthly calls" with the Project Officer "to obtain input on program activities." (*Id*. at 6, 8-9).

37. By its terms, the Award obligated Community Power to comply with "all procurement actions" under the Award and "[as] set forth in Title 2 CFR, Parts 200.317 through 200.327, 2 CFR Part 1500 and 40 CFR Part 33." (*Id*. at 11). The Award specified that EPA, through the assigned Project Manager, "will be substantially involved" in Community Power's performance under the Award. (*Id*.). That substantial involvement included "[j]oint operational involvement, participation, and/or collaboration between EPA and [Community Power]." (*Id*. at 12).

38. The Award on its face contains no term, condition, or other provision governing or relating to *termination* of the Award by EPA. The Award itself does not include any provision authorizing EPA to terminate Community Power's funding grant on the grounds that *program goals* or *EPA priorities might change*. Although the Award referred to general EPA terms and conditions from 2023 that addressed unilateral termination based on a change in funding priorities (*see* Award at 6; referring to https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later), by the time EPA terminated the Award in 2025, the Office of Management and Budget and EPA had clarified the requirements for a unilateral termination, as set forth below.

39. The Award contained no provision allowing EPA to terminate for convenience.

40. Community Power did not file a notice of disagreement with the Award's terms and conditions within 21 days of the Award.

B. **Relying on the Award, Community Power Continues**
**<u>Fulfilling Its Obligations and the Agreed-Upon Project Goals</u>**

**(i) <u>EPA Amends the Award to Meet Community Power's Personnel Needs</u>**

41. With the Award being formally issued, Community Power continued its project work, planning on receiving $500,000 for the next three years. In about the <u>fall of 2024</u>, Community Power submitted an updated SF-425 for approval for obtaining budget adjustments. The proposed adjustments revised salaries for the personnel who were necessary to Community Power's environmental justice mission.

42. In consequence, EPA issued an Assistance Amendment on <u>December 5, 2024</u>. ("<u>Amendment</u>," **<u>Ex. 6</u>**). Per its terms, the "rebudgeting amendment revise[d] the current budget to coincide with the workplan." (Amendment at 1; *see id*. at 3 [revised budget]).

43. As in the Award, the Amendment stated that "[t]he revised budget and workplan activities are in accordance with the Clean Air Act; Sec. 138 guidelines." (*Id.* at 1). The Amendment also referenced regulatory authority, incorporating 2 C.F.R. 200. (*Id*. at 2). Further, the Amendment "incorporate[d] the October 2024 revisions to 2 CFR 200" as updated "General Terms and Conditions and regulations [that] appl[ied] to activities on or after the date of [the Award]." (*Id*. at 5).

44. Like the Award, the Amendment reiterated that EPA agreed "to cost-share 100%" of the budgeted costs. (*Id*. at 1).

45. Also like the Award, the Amendment stated that the goal of the funding "is to have an energy navigation program become a permanent program." (*Id.*).

46. The Amendment did not include any provision concerning termination of the Award by EPA. It also contained no provision for termination based on a change in program goals or EPA priorities, or a termination for convenience.

47. Once the Amendment adopted the revised budget, Community Power had approval to make its salary changes. Community Power drew initial funding after December 5, 2024, the date of the Amendment.

**(ii) Community Power Makes Substantial Progress on Its Obligations By 2024 Year-End**

48. Within the first six months of the Award period, Community Power progressed on its project objectives. For example, by December 31, 2024, Community Power had completed about 80% of the project's design phase. (*See* Semiannual Progress Report submitted 1/28/25 ¶ 2; **Ex. 7**). By that date, Community Power had met with its Advisor Council and obtained feedback on hiring new personnel and targeting neighborhoods for the community engagement process. (*Id.*). Community Power, working with the University of Minnesota, had created an evaluation matrix for gauging the project's success and its overall benefits and impacts. (*Id.*). Community Power also met with the Minnesota Department of Commerce and the Minneapolis Mayor's Office to discuss the project and learn about other energy efficiency projects. (*Id.* ¶ 5).

49. Among the further accomplishments in this timeframe, Community Power: (i) met with other "Navigator style" programs and reviewed their case studies, enabling it to refine the skills desired for its planned hires and to learn how best to promote neighborhood networking efforts; (ii) circulated an email survey to residents in target communities and collected the responses, thereby advancing Community Power's understanding of what most concerned residents about energy efficiency programs; and (iii) created systems and a plan for hiring new

full-time employees. (*Id.* ¶ 3). Community Power personnel also completed the required training sessions.

50. Thus, during the first half-year of the three-year funding period, Community Power -- anticipating receiving $500,000 -- had proceeded to meet its project objectives. In doing so, it made expenditures, committed scarce resources, and otherwise invested in the project with the Award's full funding in mind.

**(iii) Consistent With the Budget, Community Power Hires Some (But Not All) of the Authorized New Employees**

51. Hiring new personnel was important to the project, as Community Power's submissions to EPA had made clear. These new hires were the "Energy Navigators" who would have experience and skills in the community-based outreach underlying the project's environmental justice goals. Thus, as set forth in the Amendment's "Total Approved Allowable Budget," the bulk of the funding was for the salaries and benefits of these new hires. (*See* Amendment at 3). Community Power's budget called for four new Energy Navigators. These new hires were Community Power's immediate focus at the end of 2024.

52. In early 2025, Community Power hired two new "Energy Navigators" employees. (*See* Community Power's Semiannual Progress Report submitted 7/25/25 ¶ 2; **Ex. 8**). Both were community-based and well trained in building-science principles related to energy conservation. Both spoke Spanish, another important qualification for serving the community. Community Power selected the Energy Navigators as a result of a robust recruitment and interview process. Upon hiring, they went through a thorough onboarding program.

**(iv) While Trying to Advance Its Mission, Community Power Soon Faces Uncertainty Over Its Funding**

53. Even before President Trump took office in January 2025, Community Power, like not-for-profits throughout the country, confronted uncertainty over continued funding. In its required report to EPA in late January 2025, Community Power referred to problems stemming from "the potential loss of the EJCPS grant funds due to potential policy decisions of the incoming [Trump] administration," which was an uncertainty that "delayed [Community Power's] hiring process." (1/28/25 Progress Report ¶ 7).

54. Still, Community Power continued to meet *its* obligations under the Award. It met (remotely) with EPA's Sample on December 23, 2024, adhering to the regular-meeting requirement. Following that meeting, in January 2025, Community Power furnished revised budgets reallocating funds among different personnel funding needs.

55. Nonetheless, come late January, EPA's Sample began putting off the meetings. She advised that EPA was awaiting guidance from OMB due to a recent Executive Order.

56. For its part, Community Power continued its reporting obligations. On January 28, Community Power submitted its Progress Report covering July 1 through December 31, 2024. (Ex. 7, noted above). Community Power participated in another required regular meeting with EPA on February 25. (*See* 2/25/2025 email from Sample, **Ex. 9**). It continued to provide revised budgets, update its budget narrative, and respond to EPA inquiries into early March 2025. (*See* email chain starting 2/27/2025 and Budget Narrative, **Ex. 10**).

## C. EPA *Abruptly Freezes* Community Power's Funding and Then *Unilaterally "Terminates"* the Award

### (i) The Freeze

57. On March 11, 2025, Community Power became unable to access funds, receiving a notification on its draw request that "[its] funds/account has been suspended." (3/11/2025 email, **Ex. 11**). Community Power had received no advance notice of this suspension. Community Power's Leticia Jones immediately emailed EPA's Sample questioning the sudden suspension. Jones wrote: "As you know, these funds are crucial for paying staff salaries and this suspension will significantly impact our ability to move the project forward and hire additional navigators." (*Id.*). Sample replied that EPA "[has] been dutifully seeking additional clarity about these [funding] issues." (*Id.*).

58. Yet funding was not restored. EPA provided no explanation.

59. On April 10, Jones sent a detailed email to multiple EPA personnel, captioned "URGENT" and requesting "immediate access to funds legally obligated to Community Power under the [Award]." (**Ex. 12**). The email noted that Community Power's "access to these funds . . . has been improperly denied for weeks without an Agency Decision" under applicable regulations "specifying particularized grounds" for suspending or terminating the funding grant. (*Id.*).

60. Community Power's email also stated:

- "[P]roject officers are not communicating with grantees" in violation of EPA's obligations under the Award;
- The funding suspension "directly contradicts" EPA's obligations under applicable regulations;

- EPA had not identified any circumstances showing that Community Power "ha[d] not complied with the terms of the [A]ward";
- EPA's "[w]ithholding this money now has already caused (and will continue to cause) irreparable harm to the communities that [Community Power] serve[s] and cost[s] invaluable jobs," stressing that Community Power "had to delay the hiring process" for its first two Energy Navigators and "[had] also indefinitely halted [Community Power's] plans to hire the additional two" Energy Navigators;
- The funding suspension would mean that Community Power would be unable "to meet payroll," and thus "would significantly reduce the possible scope of [its] program, meaning fewer residents in the communities we aim to serve would receive our support in making energy efficiency upgrades";
- A very recent federal court decision had found that a grant termination prescribed in an Executive Order was "likely unconstitutional." (*Id.*)

61. Community Power stated that, for its part, it was committed "to fulfill [its] obligations under [the Award]" until and unless it received a "proper Agency Determination" that would "establish[] grounds for termination *under the terms and conditions of our [Award]*." (*Id.*). That is, Community Power "want[ed] to continue to make progress towards achievement of key policy goals associated with the Trump Administration." (*Id.*).

62. Thus, the email urged that Community Power's funding "be reinstated . . . **immediately."** (*Id.*; **bold** in original).

63. Less than a week later, on April 16, Community Power sent an updated email demanding reinstatement of the funding. (**Ex. 13**). In addition to reiterating the previously stated

grounds, this email identified another very recent federal court decision that supported the reinstatement.

64. Getting no response to its two "Urgent" emails, Community Power's Jones again wrote to EPA on April 28. (**Ex. 14**). The email requested reimbursement under the Award for "expenses and payroll" incurred in February and March. The email also emphasized that "[Community Power has] not received any termination or suspension letters." (*Id.*).

65. The next day, April 29, EPA informed Community Power that funding access *was restored*, and Community Power then drew down funds. (**Ex. 15**). Community Power requested that EPA provide "clarity" on the status of funding "to help [Community Power] in making future decisions related to how we hire staff with the use of these funds."

66. Ultimately, however, Community Power was able to hire only two of the four Energy Navigators allotted for in the Award budget. (7/25/25 Progress Report ¶ 2). That was because the restored funding access was extremely short-lived.

**(ii) The Termination**

67. On May 9, 2025, Community Power received a Memorandum stating that EPA "is hereby terminating" the Award, "effective immediately." ("Termination Memorandum"; **Ex. 16**). The reason given for the purported termination was that "the remaining portion of the Federal award will not accomplish EPA funding priorities for achieving program goals. The objectives of the award are no longer consistent with EPA funding priorities." (Termination Memorandum at 1).

68. The Termination Memorandum further advised:

> EPA Administrator has determined that, per the Agency's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Agency's grants do not conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions. In addition to

> complying with the law, it is vital that the Agency assess whether all grant payments are free from fraud, abuse, waste, and duplication, as well as to assess whether current grants are in the best interests of the United States.

69. The Termination Memorandum offered no other grounds, and no statutory authority, for the termination. It did not explain, for example, why the Award would "no longer" accomplish EPA funding priorities, or even what the supposedly new funding priorities might be. Likewise, it offered no "conflicts" between Community Power's funding grant and EPA policies or statutory functions, nor did it identify any "fraud, abuse, waste [or] duplication" involving Community Power's conduct in implementing the Award. It did not identify any termination provision in the Award itself.

70. Also on May 9, EPA sent an "Assistance Amendment" directing Community Power to "stop work" and "terminate the agreement," together with other instructions for the funding cut-off. ("Award Termination"; **Ex. 17**). The Award Termination pronounced that EPA was terminating "[p]er CFR 200.340 and the Termination General Terms and Conditions of this agreement." The Administrative Conditions portion of the Award Termination stated that "[t]he [EPA] is asserting *its right* under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to *unilaterally terminate* this award." (Award Termination at 5; emphasis added). The Award Termination did not identify any specific grounds under Section 200.340 for the unilateral termination, nor did it identify any termination provision in the Award.

71. As of May 9, 2025, Community Power had drawn down $124,755.10 of the $500,000.00 grant amount, leaving $375,244.90 otherwise available for funding. (*See* 7/25/25 Progress Report ¶ 10). Community Power had drawn these funds principally for its new hires as project-critical long-term employees.

D. **EPA Rejects Community Power's Administrative Appeals**

**(i) Community Power Submits Extensive Materials to Support *Reversal* of the Termination**

72. On May 29, 2025, Community Power submitted extensive documentation to support its position that EPA terminated the Award improperly.

73. This documentation included: (a) Notice of Disagreement, stating "formal notice that Community Power disagrees with EPA's Unilateral Termination of Assistance Agreement"; among the reasons given was that "[t]he EPA is not authorized to unilaterally change the law or implement policies that have not been authorized by Congress"; (b) Requests for Costs, setting forth a claim for $7,014.95 in costs "properly incurred . . . that happened prior to the termination" on May 9; the Request cited the C.F.R. provisions authorizing the claim; and (c) Notice of Wrongful Termination of the Award under 2 CFR 200.340, reiterating that Community Power "disagree[d] with the decision to terminate the [Award]," asking that it be reversed; the Notice contended that EPA's proffered grounds -- that the grant supposedly "will not accomplish EPA funding priorities for achieving program goals and that the objectives of the award are no longer consistent with EPA funding priorities" -- are *not* "allowed under the terms and conditions of [Community Power's] grant or under existing law." (Collectively, **Ex. 18**).

74. EPA did not respond to these submissions.

75. Community Power wrote again on June 12, 2025, restating (at p. 1) its request that EPA "withdraw the termination." (**Ex. 19**). Community Power voiced "[its] need to timely resume work" authorized under the Award. It also observed that the many widely publicized funding terminations of federal grants were "not individualized, carefully considered terminations but boilerplate terminations carried out *en masse* without regard to our individual rights." (*Id.*). The request concluded (at p. 2) that Community Power's prior submissions

provided "a sufficient basis for the [EPA Dispute Decision Official] to make an expedited determination . . . on the merits of the matter."

**(ii) EPA Refuses to Withdraw Its Termination**

76. On August 29, 2025, the Dispute Decision Official issued her decision, dismissing Community Power's request for reinstatement of the Award. (**Ex. 20**). The Official's decision cited the "One Big Beautiful Bill Act (OBBBA)." She stated that the OBBBA (with one exception not applicable to the Award) "rescinds unobligated balances from all EPA Inflation Reduction Act (IRA) accounts"; that the Award "was funded entirely by OBBBA-impacted funding and was terminated"; and that funds obligated under the Award (less certain allowable costs) "became legally unobligated and subject to rescission." The decision concluded that "the EPA cannot offer reinstatement as a remedy" and "[t]herefore, the administrative dispute regarding the termination is moot." (*Id.*)

77. The decision set forth no justification specific to Community Power or the Award itself for the termination. It did not link the termination to any breach by Community Power, misuse of funds, or other project-specific grounds for termination. And it cited no term, conditions, or language in the Award to justify the termination.

78. Shortly thereafter, on September 5, 2025, Community Power lodged its objection to the Dispute Decision Official's decision and again to the termination. The objection noted: "the work that we were required to do under our legally binding Federal award agreement has necessarily been left incomplete." (**Ex. 21**).

79. EPA did not respond. On December 23, 2025, Community Power submitted its Final Federal Financial Report in compliance with 2 C.F.R. § 200.344(b). (**Ex. 22**). It did so "under protest and with reservation of all available legal rights and remedies." Community

Power also stated its desire (at p. 2) "to discuss a settlement negotiation" rather than file a legal claim.

80. EPA responded in January 2026, requiring Community Power to provide particular information on the close-out formality. Community Power endeavored to comply with EPA form-specific requirements. In doing so, Community Power continued to preserve its rights and its position that EPA had terminated its grant improperly.

81. EPA never responded to Community Power's proposal to discuss settlement.

## CLAIMS

### FIRST CLAIM
### (Breach of Contract)

82. The paragraphs above are incorporated and reasserted as if fully set forth here.

83. The elements for recovery for breach of contract are: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

84. To form a binding contract with the government, there must be "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citing cases).

#### A. Valid Contract and Obligation/Duty

85. The Award constitutes a binding contract between Community Power and the United States, subsisting and enforceable on its terms and conditions.

86. The RFA, Proposal, and Award manifest a mutual intent to be contractually bound.

87. The RFA, Proposal, and Award, together with Community Power's determination not to file a notice of disagreement with the Award's terms and conditions, establish, without ambiguity, an offer by EPA and an acceptance by Community Power.

88. Both EPA and Community Power gave and received sufficient and valuable consideration to form a binding contract:

a) EPA furnished consideration by promising to provide funding to Community Power in the amount of $500,000 over the period July 1, 2024 through June 30, 2027. Prior to termination of the Award, EPA funded $124,755.10 of the $500,000.00 grant under the Award.

b) Community Power furnished consideration, as required under the terms and conditions of the Award, that provided tangible benefits directly to EPA and the United States, in several respects:

- Community Power agreed to provide information and data to EPA that would help EPA evaluate the success of its Environmental Justice Grants program;
- Community Power agreed to provide data pertaining to minority-owned/women-owned businesses to help the federal government assess its programs for assisting disadvantaged businesses;
- Community Power agreed to provide data and information that would help the federal government, in accordance with Executive Order 14395, combat "fraud, waste, and abuse" in federal benefit programs;
- Community Power agreed to develop a pilot-like program that would be a deliverable to EPA as the basis for a permanent energy navigation program;

- Community Power's promises assisted EPA to meet its publicly-stated specific goals and objectives set forth in EPA's Strategic Plan; and
- Community Power's promises helped EPA meet the purposes and goals of enabling legislation for funding and Executive Orders designed to promote environmental justice and civil rights.

89. The Award was executed by government officials with actual and legal authority to bind the United States in contract.

90. Further, the United States has acknowledged in litigation that financial assistance awards constitute binding contracts between the recipients and the United States. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir.) ("The Department [of Education] points to the fact that each grant award takes the form of a contract between the recipient and the government."). *stay granted*, 145 S. Ct. 966 (2025); *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 145 F.4th 39, 48 (1st Cir. 2025) ("[The Department of Health and Human Services] leans heavily on its argument that the district court lacked subject matter jurisdiction to hear this case, claiming that it is a contract dispute about damages and thus belongs in the Court of Federal Claims."), *stayed granted in part*, 145 S. Ct. 2658 (2025).

91. Under the Award, EPA had the duty and obligation to provide funding to Community Power in accordance with the terms and conditions of the Award and applicable law.

92. Community Power complied with all of its obligations and with the duties imposed upon it under the Award.

93. Further, by terminating the Award and directing Community Power to stop its work under the Award,

a) EPA prevented Community Power from drawing further funding under the Award; and

b) EPA also prevented Community Power from undertaking any costs that would otherwise have been incurred, and then approved and deemed allowable under the terms of the Award.

B. **<u>EPA's Breach of Duty</u>**

94. EPA terminated the Award unlawfully, and thereby breached its duty under the Award, as follows:

**(i) EPA Stated That It Unilaterally Terminated the Award <u>Based Only on a Supposed "Change in Funding Priorities"</u>**

95. EPA stated that it terminated the Award on the basis that the Award "will not accomplish EPA funding priorities for achieving program goals [and] [t]he objectives of the award are no longer consistent with EPA funding priorities." (Termination Memorandum at 1).

96. EPA further stated that it terminated the Award "[p]er CFR 200.340 and the Termination General Terms and Conditions of this [Award]." (Award Termination at 1). EPA asserted that it was entitled to terminate (a) "unilaterally" and (b) as of "right" "under 2 C.F.R. § 200.340." (*Id.* at 5).

97. These statements are the sole basis EPA provided to Community Power for termination of the Award. EPA at no time asserted that Community Power had failed to comply with its obligations under, or with any terms and conditions of, the Award; nor did EPA ever assert that Community Power had otherwise acted improperly with respect to its performance under the Award. Community Power did not consent to the termination.

98. The Award contains no term or provision authorizing EPA to unilaterally terminate the Award.

99. EPA stated its own unwillingness to fulfill its obligations and to continue its performance under the Award, thereby repudiating the Award.

**(ii) EPA Terminated Unlawfully**

100. EPA's termination of the Award violated federal regulations and statutes governing a federal agency's unilateral termination of a funding award.

101. Federal government financial assistance awards are governed by Title 2 of the Code of Federal Regulations, as promulgated by the Office of Management and Budget. Title 2 sets forth "guidance to Federal agencies on government-wide policies for the award and administration of Federal financial assistance . . . and Federal agency regulations implementing that OMB guidance." 2 C.F.R. § 1.100. Section 200.340 of C.F.R. Title 2, which EPA referred to in its termination explanation to Community Power, governs the termination of awards.

102. Under Section 200.340, grounds for agency termination include: (i) "if the recipient . . . fails to comply with the terms and conditions of the Federal award"; or (ii) "with the consent of the recipient . . . , in which case the two parties must agree upon the termination conditions." 2 C.F.R. § 200.340(a)(1), (2). The regulation also allows termination:

> By the Federal agency . . . *pursuant to the terms and conditions of the Federal award, including*, to the extent authorized by law, if an award *no longer effectuates the program goals or agency priorities*. *Id*., § 200.340(a)(4). (emphasis added).

103. Section 200.340 further states: "The Federal agency . . . must clearly and unambiguously *specify all termination provisions in the terms and conditions of the Federal award*." *Id*., § 200.340(b) (emphasis added).

104. These provisions applied when EPA terminated Community Power's Award in May 2025.

105. The regulatory history of Section 200.340 confirms that this prerequisite -- that an agency can unilaterally terminate an award, including for the change-of-priorities basis, only if the termination provision is contained "in the terms and conditions of" the award itself -- applies to EPA's termination of the Award here:

a) In August 2020, OMB amended then-existing language of Section 200.340 to allow termination "when the Federal award no longer effectuates the program goals or Federal awarding agency priorities." 85 Fed. Reg. 49507 (Aug. 13, 2020). OMB did so "to strengthen the ability of the Federal awarding agency to terminate Federal awards." *Id.* This revised guidance also stated: "Federal awarding agencies must clearly and unambiguously articulate the conditions under which a Federal award may be terminated [i] in their applicable regulations *and* [ii] *in the terms and conditions of Federal awards*." *Id*. at 49507; *see id*. at 49559-60 (text of revised § 200.340).

b) In April 2024, OMB further revised Section 200.340 "to provide[] greater clarity" on award terminations. 89 Fed. Reg. 30089 (Apr. 22, 2024). OMB advised that an agency could terminate on the basis that an award "no longer effectuates the program goals or agency priorities *[p]rovided that the language is included in the terms and condition[s] of the award*." *Id*. at 30089; *see id*. at 30169 (text of § 200.340(a)(4): permitting termination "pursuant to the terms and conditions of the Federal award, *including* . . . if an award no longer effectuates the program goals or agency priorities."; emphasis added). In adding this language, OMB intended to "underscor[e] the need for agencies . . . to clearly and unambiguously communicate termination conditions *in the terms and conditions of the award*." *Id*. 30089 (emphasis added).

c) OMB's 2024 amendment was effective October 1, 2024. 89 Fed. Reg. 30046. However, OMB's guidance is not self-executing, and "each Federal agency . . . is

responsible for [i]mplementing the guidance." 2 C.F.R. § 1.305. The 2024 amendment thus stated that "Federal agencies may elect to apply the final guidance to Federal Awards issued *prior to* October 1, 2024." 89 Fed. Reg. 30046.

d) EPA did so by a Notice dated July 3, 2024. 89 Fed. Reg. 55262. EPA's Notice stated that "[it] has adopted OMB's Federal Financial Assistance regulations [involving] 2 CFR part 200[], including any amendments." *Id.* at 55263. EPA stated that, "in an effort to provide clarity on termination of its awards as expeditiously as possible, EPA has decided to apply the *revised version of 2 CFR 200.340* [*i.e.*, OMB's 2024 amendment] to EPA financial assistance agreements awarded . . . *on or after <u>July 1, 2024</u>*." *Id.* (emphasis added). As EPA further explained its position: "Consistent with the revised termination provision, EPA will clearly and unambiguously specify all termination provisions *<u>in the terms and conditions of applicable awards</u>, including an express authorization for unilateral termination when dictated by case- or program-specific needs*." *Id.*

106. Accordingly, as a matter of law, EPA can unilaterally terminate an award on the ground that the award no longer effectuates EPA priorities or policies *<u>only if</u>* the award itself unmistakably specifies that ground as a basis for termination. *See generally Metro. Transp. Auth. v. Duffy,* No. 25-CV-1413 (LJL), 2026 WL 588117, at *47-51 (S.D.N.Y. Mar. 3, 2026) ("[S]ubsection 200.340(a)(4) [is] best understood to empower agencies to include a provision, *up front*, that an award is terminable based on a unilateral determination that it does not effectuate agency goals and priorities. 'The regulation is properly read as stating that an award may be terminated on the ground that it no longer effectuates the program goals or agency priorities *only if* such a ground . . . is actually included as a term and condition of the federal award.'" (quoting *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 670 (S.D.N.Y. 2025)) (emphasis added).

107. Since EPA determined to apply this requirement to awards issued after July 1, 2024 (89 Fed. Reg. 55262), it applied as of July 23, 2024, when EPA issued the Award to Community Power.

108. The Award contained no term, provision, or condition permitting termination on the basis that the Award no longer effectuated EPA priorities or policies. (*See* Award, *passim*). Nor did the December 2024 Amendment. (Amendment, *passim*).

109. Moreover, the Amendment incorporated the October 2024 revisions to 2 CFR 200 (Amendment at 5), which further clarified that EPA could terminate the Award on this basis only if "the language is included in the terms and condition[s] of the award," "clearly" and "unambiguously." *See* 89 Fed. Reg. at 30089, 30169.

110. EPA violated the applicable legal requirements for the unilateral termination of the Award.

111. By doing so, EPA materially breached the Award.

C. **Injury and Damages**

112. "As with private agreements, when a government contract is breached, there is a presumption that a damages remedy will be available." *Higbie v. U.S.*, 778 F.3d 990, 993 (Fed. Cir. 2015).

113. As a direct and but-for result of EPA's material breach, Community Power has been injured and has suffered damages.

**(i) "Expectation" Damages**

114. The injury to Community Power includes: elimination of Community Power's programs, thereby preventing Community Power from fulfilling its fundamental mission and project-based goals; reduction or curtailment in the scope and breadth of Community Power's

outreach to the community; inability to hire and retain sufficient personnel to fulfill both Community Power's project-based work and its other community-outreach programs and services; reputational harm, due to Community Power's inability to fulfill its public-facing mission and project-based goals; and weakening and impairment of Community Power's financial stability, thereby creating an actual existential threat to Community Power's continued viability as a 12-year-old nonprofit organization that has served its local community.

115. Under the Award, Community Power reasonably expected that it would be able to meet its project goals and objectives. However, as a result of EPA's breach, and the injury suffered from the breach, Community Power has been prevented from fulfilling its project goals and objectives as bargained for in entering into the Award.

116. Community Power's Proposal and EPA's Award established, with specificity, the purpose, use, and goals of the funding to be provided. Thus, when entering into and issuing the Award, EPA had reason to foresee, and should have reasonably foreseen, that the above-described injury would be a probable result if EPA were to breach the Award.

117. "In breach of contract disputes, injured parties are awarded expectancy damages designed to replicate full performance of the contract. The goal of expectancy damages is to put the non-breaching party in the position it would have occupied but for the breach." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017); *accord Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("A party's expectation interest is the 'interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'") (quoting *Restatement (Second) of Contracts* § 344(a) (1981)).

118. Community Power is entitled to receive expectation damages as compensation for the injury suffered.

119. Expectation damages here entitle Community Power to receive the full amount of the Award, $500,000, less amounts actually received.

**(ii) <u>"Reliance" Damages</u>**

120. A plaintiff who has suffered "[a] 'loss caused by reliance on the contract'" is entitled to be compensated for that loss. *Landmark Land Co., Inc. v. United States*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (also quoting *Restatement (Second) of Contracts* § 344(b)).

121. Community Power is entitled to recover its out-of-pocket costs incurred in reliance on the RFA, on EPA's selection of Community Power to receive a funding grant, and on the consequent Award.

122. Community Power devoted substantial time and effort of its workforce in applying for funding under the RFA, particularly in researching and collecting data for Community Power's Proposal, drafting the Proposal, and preparing the Proposal for submission to EPA in April 2023. *See* Proposal, *passim*.

123. When EPA then notified Community Power on October 20, 2023, that its application for funding had been approved, Community Power, as set forth above, undertook substantial time-consuming efforts and incurred significant costs to meet EPA's requirements for receiving an actual award of funding and to begin accomplishing its project goals. *See* ¶¶ 22-27 above.

124. After EPA issued the Award on July 23, 2024, Community Power continued to devote workforce time and expense to its project goals in reliance on receiving the full amount of funding provided for under the Award. *See* ¶¶ 41-56 above.

125. When EPA issued the RFA, selected Community Power to receive a funding grant, and issued the Award, EPA, at each such stage, had reason to foresee, and should reasonably have foreseen, that Community Power would take the above-described actions and incur the above-described costs and expenses.

126. Community Power's expenses and costs, including the monetary time value of its workforce, constitute loss that Community Power is entitled to recover as reliance damages resulting directly from EPA's breach.

127. The aggregate amount of these damages is readily calculable.

**SECOND CLAIM**
**(Breach of the Implied Covenant**
**of Good Faith and Fair Dealing)**

128. The paragraphs above are incorporated and reasserted as if fully set forth here.

129. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citation omitted); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (citing *Rumsfeld v. Freedom NY, Inc.,* 329 F.3d 1320, 1330 (Fed. Cir. 2003)) (emphasizing "[this] duty applies to the government just as it does to private parties").

130. EPA, and the United States, had an implied duty of good faith and fair dealing under the Award.

131. The implied duty of good faith and fair dealing "includes 'the duty . . . not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the

contract.'" *Dobyns*, 915 F.3d at 739 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

132. EPA took actions that destroyed Community Power's reasonably expected fruits it would have realized under the Award. Those actions included:

- EPA gave no reason for terminating the Award specific to Community Power; EPA based termination on nothing more than the broad -- even boilerplate -- change-in-priorities rationale; EPA did not explain the "priorities change" and did not clearly and unambiguously state a credible reason for termination;
- In particular, EPA did not explain why its "Environmental Justice" goal was no longer good policy; however, Community Power's Proposal for funding had met EPA's Request for Applications, such as setting forth a detailed Environmental Justice Collaborative Problem-Solving model in accord with the RFA's foundational funding requirements;
- Community Power pursued all administrative appeal procedures available to it; in that process, EPA gave no meaningful or specific explanation for the termination; the process appeared to be a sham, giving no meaningful consideration or analysis to Community Power's detailed submissions; the final decision by EPA's Disputes Decision Official avoided the merits and denied relief because the administrative dispute supposedly became "moot";
- As set forth, Community Power reasonably relied on EPA's contractual promise of funding per the Award by taking actions and committing its resources to the purposes of the Award;

- EPA did not abide by its own commitment, per regulatory Notice (89 Fed. Reg. 55262), to follow OMB's regulation requiring that a termination based on a "change of priorities" be set forth as a ground for termination in the Award itself; and
- The overall facts and circumstances demonstrate that EPA terminated the Award arbitrarily, capriciously, unreasonably, and inconsistently with Community Power's reasonable expectation of funding.

133. In consequence, EPA breached its implied duty of good faith and fair dealing in its performance and enforcement of the Award.

134. On June 11, 2026, a United States District Court held that EPA's termination in the entirety of its Environmental and Climate Justice Block Grant Program (*see* ¶ 14 above) was illegal as a violation of the Administrative Procedure Act. *Sustainability Inst. v. Trump,* No. 2:25-2152-RMG, 2026 WL 1694522 (D.S.C. June 11, 2026). The Court ruled that "EPA's guidance terminating the ECJ Program was arbitrary and capricious and contrary to the law," and noted that "this finding . . . could be independently relevant to any grant claims Plaintiffs bring before the CFC." *Id*. at *5 & n.3.

135. Community Power complied with all of its obligations under the Award.

136. EPA never asserted that Community Power breached the Award in any respect.

137. As a direct result of EPA's breach of its implied duty of good faith and fair dealing, Community Power has been injured and has suffered damages.

138. Community Power's injury and damages are substantially the same as those set forth in the paragraphs above.

**RELIEF REQUESTED**

Plaintiff requests that this Court enter judgment against the United States as follows:

i. Awarding damages to Plaintiff in the amount set forth above and as may be further determined at trial or other proceedings;

ii. Awarding pre- and post-judgment interest as authorized by law;

iii. Awarding Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, under 28 U.S.C. § 2412; and

iv. Granting such other relief as the Court may deem proper.

Dated: August 13, 2026

Respectfully submitted,

Scott Himes
SCOTT HIMES LAW PLLC
73 Willow St.
Brooklyn, NY 11201
917-741-3316
scotthimeslaw@gmail.com

*Of counsel:*

*s/ Gary DiBianco*
Gary DiBianco
LAWYERS FOR GOOD GOVERNMENT, INC
1319 F St NW, Ste 301
PMB 181
Washington, DC 20004
404-913-5529
gary@lawyersforgoodgovernment.org

*Attorneys for Plaintiff Community Power*

**TABLE OF EXHIBITS**

**(with applicable abbreviations)**

| | |
|---|---|
| Request for Applications Funding No. EPA-R-OEJECR-OCS-23-01, dated January 10, 2023 [RFA] | **Exhibit 1** |
| Community Power's funding application, "Environmental Justice Collaborative Problem-Solving (EJCPS) Proposal," dated April 2023 [Proposal] | **Exhibit 2** |
| Emails from EPA notifying Community Power of its selection for a funding award, and Community Power's acceptance, dated October 20, 2023 | **Exhibit 3** |
| Select documents pertaining to Community Power's actions to fulfill Award requirements | **Exhibit 4** |
| Cooperative Agreement with Notice of Award to Community Power, dated July 23, 2024 [Award] | **Exhibit 5** |
| Assistance Amendment with Notice of Award to Community Power, dated December 5, 2024 [Amendment] | **Exhibit 6** |
| Community Power's Semiannual Progress Report, dated January 28, 2025 | **Exhibit 7** |
| Community Power's Semiannual Progress Report, dated July 25, 2025 | **Exhibit 8** |
| Email from EPA, dated February 25, 2025 | **Exhibit 9** |
| Email chain among EPA and Community Power, dated February 27, 2025 | **Exhibit 10** |
| Email from Community Power, dated March 11, 2025 | **Exhibit 11** |
| Email from Community Power to EPA, dated April 10, 2025 | **Exhibit 12** |
| Email from Community Power to EPA, dated April 16, 2025 | **Exhibit 13** |
| Email from Community Power to EPA, dated April 28, 2025 | **Exhibit 14** |
| Email from EPA to Community Power, dated April 29, 2025 | **Exhibit 15** |
| Letter from EPA terminating Award, dated May 9, 2025 [Termination Memorandum] | **Exhibit 16** |
| "Assistance Amendment" terminating Award and funding agreement, dated May 9, 2025 [Award Termination] | **Exhibit 17** |
| Notice of Disagreement; Requests for Costs; and Notice of Wrongful Termination of the Award under 2 CFR 200.340, each dated May 29, 2025 | **Exhibit 18** |
| Community Power email to EPA, dated June 12, 2025 | **Exhibit 19** |
| EPA Dispute Decision Official's Decision, denying Community Power's reinstatement request, dated August 29, 2025 | **Exhibit 20** |

Community Power email to EPA, dated September 5, 2025 **Exhibit 21**

Email transmitting Community Power's Final Federal Financial Report, dated December 23, 2025 **Exhibit 22**